IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

PHILIP ROBERT CORRAL,

              Petitioner,

vs.

STUART SHERMAN, Warden, Substance
Abuse Treatment Facility and State Prison,[1]

            Respondent.

No. 2:16-cv-00143-JKS

MEMORANDUM DECISION

Philip Robert Corral, a state prisoner proceeding *pro se*, filed a Petition for a Writ of

Habeas Corpus with this Court pursuant to 28 U.S.C. § 2254. Corral is in the custody of the

California Department of Corrections and Rehabilitation and incarcerated at the Substance

Abuse Treatment Facility and State Prison in Corcoran, California. Respondent has answered,

and Corral has not replied. On December 19, 2017, this Court, through a different District Judge

and Magistrate Judge than the undersigned, denied the habeas petition of Corral's co-defendant

Gabriel Langarica in Case No. 2:16-cv-00080-KJM-AC, Docket Nos. 22, 23. Corral's petition

involves the same facts but raises different grounds for relief than those addressed in Langarica's

case.

## I. BACKGROUND/PRIOR PROCEEDINGS

On March 17, 2009, Corral, along with Langarica, was charged with kidnapping for

ransom (Count 1), two counts of forcible rape during the commission of kidnapping and

---

[1]       Stuart Sherman, Warden, Substance Abuse Treatment Facility and State Prison,
Corcoran, is substituted for X. Cano, former Warden, California State Prison, Los Angeles
County. FED. R. CIV. P. 25(c).

residential burglary (Counts 2, 3), forcible oral copulation during the commission of kidnapping and residential burglary (Count 4), assault with intent to commit sex crimes during the commission of residential burglary (Count 5), residential robbery (Count 6), residential burglary (Count 7), and criminal threats (Count 8). The information further alleged as status enhancements that Corral had been convicted of, and served a separate prison term for, robbery in 2004 and assault with force likely to produce great bodily injury in 2007. Corral pled not guilty, denied the allegations, and proceeded to jury trial on May 18, 2011. On direct appeal of his conviction, the California Court of Appeal laid out the following facts underlying the charges against Corral and the evidence presented at trial:

> Phillip Corral, then in his mid-twenties, recruited four younger men to accompany him in a stolen Chevrolet Suburban to collect a debt from a man he identified as Gustavo. The group included Corral's brother Gabriel Langarica, plus Robert Ortega, Francisco Barba, and a man they called "Smiley." Barba said he knew Langarica from school, but he had not previously met Corral. Barba remembered Corral as a light-skinned bald Mexican. Barba met Ortega on the day of the crime. Ortega had known Langarica for several months and had known Corral a shorter time.
>
> Near midnight on the evening of October 13, 2006, Ortega stole an old Suburban and turned it over to Corral. Barba and Ortega testified that Corral was the leader and driver that night. Ortega testified that Corral promised to pay him to "rough up" Gustavo.
>
> Gustavo later acknowledged a dispute with a man over a car and said the man had threatened to kill him. Gustavo said he had recently repossessed the car after the other man stopped making payments on it. He denied knowing the defendants. Gustavo worked at a restaurant where he normally finished work between midnight and 1:00 a.m.; that night, he did not leave work until about 1:00 a.m.
>
> Just before 1:00 a.m., Corral drove the men in the Suburban to the parking lot of an apartment building; Corral said Gustavo lived there and would be getting home from work. The plan was to knock on the apartment door, and if there was no answer, to break in and "rough up" Gustavo, whom they expected would be hiding inside. Corral carried a cane and Ortega carried a bat.
>
> After knocking on the apartment door, Corral kicked the door down. Gustavo's wife had been asleep in the apartment's only bedroom. The couple's two young children were asleep in the same room. The men began hitting the wife and shouting at her about her husband and "the money." She described the men as Hispanic. They first spoke

2

English, but when she responded in Spanish, they switched to Spanish.[FN1]  The wife said a Latino man with a light complexion beat her with a bat and threatened to kill her.

> FN1.   At all relevant times, the wife's testimony was translated from Spanish to English.

The wife said the same man grabbed her and dragged her to a sports utility vehicle, where he got into the driver's seat and threw her into the backseat with some of the other men, asking that she tell him how to find her husband's workplace so he could collect $3,000 from him.  Barba and Ortega identified Corral as the man who repeatedly hit the wife, dragged her to the car and drove away to find her husband.  Ortega testified that Langarica took the wife's purse from the apartment, and that Corral took some keys.

As the Suburban drove toward the restaurant where Gustavo worked, Corral laughingly told the men in the backseat to search the wife for weapons; one of the men removed her nightgown.  The men beside her blindfolded her and began touching her breasts.

Gustavo left the restaurant before the group arrived there.  Corral made a call on his cell phone to report that Gustavo was not there, and then drove toward a remote location, talking about killing or getting rid of the wife.  Gustavo testified that when he arrived at his apartment, he found the door broken and his daughter running to tell him "mommy wasn't home."  After calling 911, Gustavo repeatedly called his wife's cell phone and heard laughter.

As the group drove away from Gustavo's workplace, the wife said one of the men beside her forced her into the cargo area behind the seat and raped her.  Then the man who had been sitting on the other side of her promptly replaced the first man and also raped her.  Ortega said Langarica and Smiley sexually assaulted the wife, one after the other, while she cried and said no.  Barba said Ortega forced the woman to give him oral sex.

The Suburban came to a stop on a dirt road beside a body of water.  The driver got out and pushed the naked victim to her knees a few feet from the back bumper, then forced her to orally copulate him.  After a car passed, he gave her his black T-shirt so other passing cars would not see she was naked.  The wife escaped on foot.  After the men drove away, she returned to the road to flag down a passing car and asked them to call police.

Police responded at 1:44 a.m.  Before an ambulance transported the wife from the scene, police showed her a California Identification Card they found at the location where she said the Suburban had been parked.  The card belonged to Robert Ortega.  The wife promptly identified him as the man who had been seated in the front passenger seat during her ordeal.  Police also found grocery receipts that had been in the wife's purse.

Ortega was arrested that morning at his home.  He had the wife's cell phone, along with a cane and bat.  Police eventually learned that the other four men were Barba, Smiley and two brothers identified only as Phil and Gabriel.  A police investigator showed the wife a photo array that included Barba's photograph; the wife positively identified him as one of the rapists.

At the preliminary hearing for Barba and Ortega, the wife identified them as the men who sat on either side of her in the Suburban and raped her. When trial commenced in this case, they were serving prison sentences for their participation in the crimes against the wife.

In mid–2008, after interviewing Barba and Ortega again, a police investigator included Corral's photograph in a "six pack" array shown to the wife; the wife pointed to his picture and, without hesitation, said "driver" in English. Later in 2008, the wife viewed other six-pack photo arrays but she did not identify Langarica from his photograph. Ortega, however, positively identified Langarica's photograph, saying Langarica sat behind the driver and beside the wife on the night of the crimes. At a 2009 preliminary hearing, the wife identified Langarica as the driver and Corral as the man who sat in the front passenger seat. An officer involved in the arrest of Corral in October 2008 said Corral looked different at his preliminary hearing in 2009: his hair was longer, he no longer had a goatee and he was wearing glasses. Ortega also testified that Corral's appearance had changed over time.

*People v. Langarica*, No. C069062, 2014 WL 4735000, at *1-3 (Cal. Ct. App. Sept. 24, 2014).

At the conclusion of trial, the jury found Corral and Langarica guilty on all counts.

Corral waived jury trial on the status enhancement allegations, and the trial court found all to be true. The court subsequently sentenced Corral to 50 years to life imprisonment on each count for rape and oral copulation; life with the possibility of parole on the count for kidnapping, and a determinate term of 31 years 8 months' imprisonment for the other counts.[2] The trial court ordered Corral and Langarica jointly and severally liable for restitution to the wife and her family.

Through counsel, Corral appealed his conviction, arguing that: 1) the trial court erred in failing to exclude evidence of the impermissibly-suggestive preliminary hearing and in-court identifications; 2) the rape convictions should be reversed because the evidence was insufficient to support the prosecution's aiding and abetting or uncharged conspiracy theories; 3) the court

---

[2]     Langarica was sentenced to 25 years to life imprisonment on each count for rape and oral copulation; life with the possibility of parole on the count for kidnapping; and a determinate term of 12 years 4 months' imprisonment for the other counts.

should stay under California Penal Code § 654[3] the sentences on Counts 5, 7, and 8 because those crimes were a means of accomplishing or incidental to other offenses for which Corral was separately sentenced; 4) the court should strike the first prison prior enhancement because the trial court also imposed a 5-year serious felony enhancement for the identical prior conviction; and 5) the minute order and abstract should be corrected to reflect the court's oral pronouncement of the restitution. Corral also joined in "all beneficial issues and arguments" raised in Langarica's appellate briefing. Respondent agreed that Corral's prior robbery conviction could not be used to impose both a 5-year term under Penal Code § 667(a) for serious felony enhancement and a 1-year prior prison term enhancement under Penal Code § 667.5, but it argued that the prison prior enhancement should be stayed rather than stricken. Respondent also agreed that the appellate court could correct clerical errors in the abstract of judgment and minute order. Respondent opposed the appeal in all other respects. On September 24, 2014, the Court of Appeal unanimously modified the judgment to stay the 1-year robbery-related prison term enhancement and corrected the abstracts of judgment, but affirmed the judgment in all other respects. *Langarica*, 2014 WL 4735000, at *12. Roughly one month later, the Court of Appeal issued an order modifying the opinion without change in the judgment. *Id.* The California Supreme Court summarily denied review on December 17, 2014. Corral's conviction became final on direct review 90 days later, when his time to file a petition for certiorari in the U.S.

---

[3]    Section 654 provides in relevant part that "[a]n act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." CAL. PENAL CODE § 654.

Supreme Court expired on March 17, 2015. *See Jiminez v. Quarterman*, 555 U.S. 113, 119 (2009); *Spitsyn v. Moore*, 345 F.3d 796, 798 (9th Cir. 2003).

Corral timely filed a *pro se* Petition for a Writ of Habeas Corpus to this Court dated December 23, 2015. Docket No. 1 ("Petition"); *see* 28 U.S.C. § 2244(d)(1)(A).

## II. GROUNDS RAISED

In support of his *pro se* Petition before this Court, Corral attaches to his Petition the Petition for Review he unsuccessfully raised before the California Supreme Court. Specifically, Corral argues that: 1) the trial court erred when it failed to exclude evidence of the impermissibly-suggestive preliminary hearing and in-court trial identifications; 2) the rape convictions should be reversed because the evidence was insufficient to support the prosecution's aiding and abetting or uncharged conspiracy theories; and 3) the court should stay under California Penal Code § 654 the sentences on Counts 5, 7, and 8 because those crimes were a means of accomplishing or incidental to other offenses for which Corral was separately sentenced. Corral's Petition, as did his petition for review, also seeks to join in the issues and arguments raised by Langarica that may accrue to Corral's benefit.

## III. STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2). A state-court decision is contrary to federal law if the state court applies a rule that

6

contradicts controlling Supreme Court authority or "if the state court confronts a set of facts that are materially indistinguishable from a decision" of the Supreme Court, but nevertheless arrives at a different result. *Williams v. Taylor*, 529 U.S. 362, 406 (2000).

The Supreme Court has explained that "clearly established Federal law" in § 2254(d)(1) "refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the time of the relevant state-court decision." *Id.* at 412. The holding must also be intended to be binding upon the states; that is, the decision must be based upon constitutional grounds, not on the supervisory power of the Supreme Court over federal courts. *Early v. Packer*, 537 U.S. 3, 10 (2002). Where holdings of the Supreme Court regarding the issue presented on habeas review are lacking, "it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'" *Carey v. Musladin*, 549 U.S. 70, 77 (2006) (citation omitted).

To the extent that the Petition raises issues of the proper application of state law, they are beyond the purview of this Court in a federal habeas proceeding. *See Swarthout v. Cooke*, 131 S. Ct. 859, 863 (2011) (per curiam) (holding that it is of no federal concern whether state law was correctly applied). It is a fundamental precept of dual federalism that the states possess primary authority for defining and enforcing the criminal law. *See, e.g.*, *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (a federal habeas court cannot reexamine a state court's interpretation and application of state law); *Walton v. Arizona,* 497 U.S. 639, 653 (1990) (presuming that the state court knew and correctly applied state law), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002).

In applying these standards on habeas review, this Court reviews the "last reasoned decision" by the state court. *See Robinson v. Ignacio,* 360 F.3d 1044, 1055 (9th Cir. 2004)

(citing *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002)).  A summary denial is an adjudication

on the merits and entitled to deference.  *Harrington v. Richter*, 562 U.S. 86, 99 (2011).  Under

the AEDPA, the state court's findings of fact are presumed to be correct unless the petitioner

rebuts this presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *Miller-El v.

Cockrell*, 537 U.S. 322, 340 (2003).

Corral has not replied to Respondent's answer.  The relevant statute provides that "[t]he

allegations of a return to the writ of habeas corpus or of an answer to an order to show cause in a

habeas corpus proceeding, if not traversed, shall be accepted as true except to the extent that the

judge finds from the evidence that they are not true."  28 U.S.C. § 2248; *see also Carlson v.

Landon*, 342 U.S. 524, 530 (1952).  Where, as here, there is no traverse filed and no evidence

offered to contradict the allegations of the return, the court must accept those allegations as true.

*See Phillips v. Pitchess*, 451 F.2d 913, 919 (9th Cir. 1971).

## IV. DISCUSSION

Ground 1.     *Suggestive Identifications*

Corral first argues that his right to due process was violated when the trial court admitted

as evidence the victim's in-court identifications of him at the preliminary hearing and at trial.

The Court of Appeal considered and rejected this claim on direct appeal as follows:

> Prior to trial, Corral and Langarica filed motions to exclude evidence of the wife's
> identification of them during what they described as an "unduly suggestive" procedure at
> their preliminary hearing.  They claim the subsequent admission of identification
> evidence was so suggestive that their constitutional rights were violated.
> Initially, the wife described the man who awakened her on the night of the crimes
> as fair-skinned and having a very short haircut.  She said that man was also the driver.
> She estimated his age to be around 30.  At the preliminary hearing, she said the man at
> counsel table (Langarica) was the fair-skinned driver.  The prosecutor had not told her
> how many defendants were charged.  Although Corral was in the courtroom, the wife
> said she did not recognize anyone else after she identified Langarica.  The trial court

observed that Corral was sitting some distance behind Langarica, had his head down and was not directly facing the witness. The next day, the prosecutor asked the wife if she recognized Corral, pointing him out and identifying him for the record as Philip. The prosecutor offered to have Corral come closer. When they were separated by about 12 feet, the wife said she recognized Corral as the man who sat in the front passenger seat.

Langarica argues the wife identified him only because he sat at counsel table for the preliminary hearing "in the position traditionally allotted to the defendant." Corral contends she identified him because the prosecutor used his first name, which the wife possibly could have heard on the night of the crimes, and because the prosecutor directed the wife's attention to him, which Corral contends impermissibly implied he was involved and insinuated that her identification of Langarica the prior day was wrong and she should "keep trying."

Acknowledging the wife's "checkered history of identification," the trial court denied the motions to exclude victim identification, ruling that the circumstances asserted by defendants went to the weight and not the admissibility of the evidence. The trial court cited *People v. Contreras* (1993) 17 Cal. App. 4th 813 (*Contreras*), expressing an intention to provide "a lot of latitude" during trial for questioning about possible misidentification.

In *Contreras*, a victim identified a defendant at a preliminary hearing after failing to recognize the defendant in photographs. (*Contreras*, *supra*, 17 Cal. App. 4th at p. 822.) Although the trial court believed the witness lied about recognizing the defendant, it admitted the evidence and allowed the circumstances to be fully explored at trial. (*Id.* at pp. 823–824.) The Court of Appeal found no constitutional unfairness because the identification issue was "largely one of credibility" and therefore a "question for the jury at trial, not an issue to be resolved in pretrial motions." (*Ibid.*)

Here, the wife had not positively identified Langarica prior to the preliminary hearing. When she did identify him, she said he was the driver, even though she had previously identified Corral as the driver. But Barba and Ortega independently identified Corral as the driver and Langarica as a participant. At trial, the wife was questioned at length about her identification of the perpetrators. The defense offered an expert witness on the fallibility of eyewitness testimony. Defense counsel argued extensively about the wife's identification errors in closing argument, at one point calling her "completely unreliable."

Citing *United States v. Wade* (1967) 388 U.S. 218, 237–238 [18 L.Ed.2d 1149, 1162–1164], Langarica claims his federal constitutional rights were violated by the trial court's failure to exclude any in-court identification as "impermissibly tainted" by circumstances of the preliminary hearing identification.[FN3] The United States Supreme Court recently clarified the holding in *Wade* and other cases involving the suppression of identification evidence, saying its intent was to prevent unfair police practices, not to eliminate suggestive identifications. (*Perry v. New Hampshire* (2012) 565 U.S. ___, ___ [181 L.Ed.2d 694, 709–710] (*Perry*).) Screening for reliability before trial is required only when it is necessary "to deter police from rigging identification procedures." (*Id.* at p. ___ [181 L.Ed.2d. at p. 703].)

The *Perry* majority emphasized its recognition that "the jury, not the judge, traditionally determines the reliability of evidence" and numerous other safeguards of the adversary system protect against "dubious identification evidence." (*Perry*, *supra*, 565 U.S. at p. ___ [181 L.Ed.2d at pp. 710–712] [mentioning vigorous cross-examination, opening and closing arguments, jury instructions and protective rules of evidence, including the admissibility of expert testimony about the hazards of eyewitness identification].)  The California Supreme Court acknowledged *Perry*'s holding in stating that the "federal Constitution's due process clause is not implicated" when suggestive identification procedures are "not arranged by law enforcement officers." (*People v. Thomas* (2012) 54 Cal.4th 908, 931.)

In this case, by the time of the preliminary hearing, two accomplices already identified the defendants.  The wife corroborated the identification by pointing to Corral in an unchallenged photo array procedure.  The trial court allowed both defendants to wear civilian clothing and Corral to wear glasses; it allowed both to choose their seats in the courtroom and also to question the wife before any identification.

Even if the procedures had been unduly suggestive, they did not implicate due process because they were not arranged by law enforcement officers. (*People v. Thomas*, *supra*, 54 Cal.4th at p. 931.)  Moreover, the California Supreme Court has "never extended the rules regarding extrajudicial identifications to subsequent identifications in court." (*People v. Carpenter* (1997) 15 Cal.4th 312, 368.)

The trial court did not err when it concluded that determining the reliability of the wife's testimony was within the province of the jury.  The trial court was not required to weigh the evidence for reliability before trial, and it was not required to exclude it.  Even when reliability is reviewed before trial, witness identification is inadmissible only when there is a ""'very substantial likelihood of irreparable misidentification."'" (*People v. Arias* (1996) 13 Cal. 4th 92, 168, quoting *Manson v. Brathwaite* (1977) 432 U.S. 98, 116 [53 L.Ed.2d 140, 155] and *Simmons v. United States* (1968) 390 U.S. 377, 384 [19 L.Ed.2d 1247, 1253].)  Defendants have not established a substantial probability that they were misidentified or a violation of due process.

*Langarica*, 2014 WL 4735000, at *3-5.

The Due Process Clause of the United States Constitution prohibits the use of identification procedures which are "unnecessarily suggestive and conducive to irreparable mistaken identification."  *Stovall v. Denno*, 388 U.S. 293, 302 (1967), *overruled on other grounds by Griffith v. Kentucky*, 479 U.S. 314, 326 (1987) (discussing retroactivity of rules propounded by Supreme Court).  Each case must be considered on its own facts and whether due process has been violated depends on "'the totality of the circumstances' surrounding the

confrontation." *Simmons v. United States*, 390 U.S. 377, 383 (1968); *see also Stovall*, 388 U.S. at 302. An identification procedure is suggestive where it "[i]n effect . . . sa [ys] to the witness 'This is the man.'" *Foster v. California*, 394 U.S. 440, 443 (1969).

If the flaws in the pretrial identification procedures are not so suggestive as to violate due process, "the reliability of properly admitted eyewitness identification, like the credibility of the other parts of the prosecution's case is a matter for the jury." *Foster*, 394 U.S. at 443, n.2; *see also Manson v. Brathwaite*, 432 U.S. 98, 116 (1977) ("[j]uries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature"). On the other hand, if an out-of-court identification is inadmissible due to unconstitutionality, an in-court identification is also inadmissible unless the government establishes that it is reliable by introducing "clear and convincing evidence that the in-court identifications were based upon observations of the suspect other than the lineup identification." *United States v. Wade*, 388 U.S. 218, 240 (1967); *see also United States v. Love*, 746 F.2d 477, 478 (9th Cir. 1984) (articulating a two-step process in determining the constitutionality of pretrial identification procedures: first, whether the procedures used were impermissibly suggestive and, if so, whether the identification was nonetheless reliable). Factors indicating the reliability of an identification include: (1) the opportunity to view the criminal at the time of the crime; (2) the witness's degree of attention (including any police training); (3) the accuracy of the prior description; (4) the witness's level of certainty at the confrontation; and (5) the length of time between the crime and the identification. *Manson*, 432 U.S. at 114 (citing *Biggers*, 409 U.S. at 199-200)). The "central question," however, is "whether under the 'totality of the

circumstances' the identification is reliable even though the confrontation procedure was suggestive." *Biggers*, 409 U.S. at 199.

Here, the Court cannot find unreasonable the Court of Appeal's determination that the trial court's procedures were unduly suggestive. The record supports that the trial court made certain accommodations, and in accordance with defense requests, to ensure the defendants' due process rights were maintained: 1) Corral and Langarica were permitted to wear civilian clothing; 2) they were given the option where to sit; 3) Corral was allowed to look away and wear eyeglasses; 4) Corral and Langarica, who are siblings, were allowed to have their family members sit in the audience; 5) Corral's counsel was permitted to voir dire the wife beforehand; and 6) both defense counsel were given wide latitude in cross-examining the identifications.

Moreover, even assuming arguendo that the pretrial identification procedures used in this case were impermissibly suggestive, the Court concludes that the in-court identifications were nonetheless reliable because they were not likely to yield an "irreparable misidentification." *Manson*, 432 U.S. at 116 (internal quotation and citation omitted). During her ordeal, the wife had sufficient opportunity to observe her assailants. And, as the Court of Appeal noted, by the time the wife made the identification, two accomplices already identified the defendants, and the wife corroborated the identification by pointing to Corral in an unchallenged photo array procedure. Under the "totality of the circumstances," and notwithstanding Corral's challenges to the identification procedure described above, this Court cannot conclude that the procedure resulted in a "very substantial likelihood of irreparable misidentification." *United States v. Kessler*, 692 F.2d 584, 586-87 (9th Cir. 1982). The decision of the California Court of Appeal to the same effect is not "so lacking in justification that there was an error well understood and

comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103.

Furthermore, as the Court of Appeal additionally noted, the due process clause does not preclude every identification that is arguably unreliable; it precludes identification testimony procured by the State through unduly suggestive pretrial procedures. This statement of law is wholly consistent with the United States Supreme Court's holding in *Perry v. New Hampshire*:

> Our decisions . . . turn on the presence of state action and aim to deter police from rigging identification procedures, for example, at a lineup, showup, or photograph array. When no improper law enforcement activity is involved, we hold, it suffices to test reliability through the rights and opportunities generally designed for that purpose, notably, the presence of counsel at postindictment lineups, vigorous cross-examination, protective rules of evidence, and jury instructions on both the fallibility of eyewitness identification and the requirement that guilt be proved beyond a reasonable doubt.

565 U.S. 228, 232-33 (2012).

As the Supreme Court explained in *Perry*, with respect to the admission of relevant evidence contended to be unreliable, the primary federal safeguards are provided by the Sixth Amendment's rights to counsel, compulsory process to obtain defense witnesses, and confrontation and cross-examination of prosecution witnesses. *Id.* at 231-32 (determining that the Due Process Clause does not require a trial judge to conduct a preliminary assessment of the reliability of eyewitness identification made under suggestive circumstances not arranged by the police). As the Court of Appeal properly concluded, the reliability of relevant testimony typically falls within the province of the jury to determine. *Id.* Absent improper police conduct or other state action, it is sufficient to test the reliability of evidence through the normal procedures, including the right to counsel and cross-examination, protective rules of evidence, the requirement of proof of guilt beyond a reasonable doubt, and jury instructions. *Id.* As

aforementioned, Corral was given wide latitude in cross-examining the wife about her identification. Corral is thus not entitled to relief on his challenges to the in-court identifications in any event.

Ground 2. *Insufficiency of the Evidence*

Corral next avers that there was insufficient evidence to support his rape convictions (Counts 2, 3) under an aiding and abetting theory. As articulated by the Supreme Court in *Jackson*, the federal constitutional standard for sufficiency of the evidence is whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in the original); *see McDaniel v. Brown*, 558 U.S. 120, 132-33 (2010) (reaffirming this standard). This Court must therefore determine whether the California court unreasonably applied *Jackson*. In making this determination, this Court may not usurp the role of the finder of fact by considering how it would have resolved any conflicts in the evidence, made the inferences, or considered the evidence at trial. *Jackson*, 443 U.S. at 318-19. Rather, when "faced with a record of historical facts that supports conflicting inferences," this Court "must presume–even if it does not affirmatively appear in the record–that the trier of fact resolved any such conflicts in favor of the prosecution, and defer to that resolution." *Id.* at 326.

It is a fundamental precept of dual federalism that the States possess primary authority for defining and enforcing the criminal law. *See Engle v. Isaac*, 456 U.S. 107, 128 (1982). Consequently, although the sufficiency of the evidence review by this Court is grounded in the Fourteenth Amendment, it must take its inquiry by reference to the elements of the crime as set forth in state law. *Jackson*, 443 U.S. at 324 n.16. A fundamental principle of our federal system

14

is "that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *see West v. AT&T*, 311 U.S. 223, 236 (1940) ("[T]he highest court of the state is the final arbiter of what is state law. When it has spoken, its pronouncement is to be accepted by federal courts as defining state law . . . ."). "Federal courts hold no supervisory authority over state judicial proceedings and may intervene only to correct wrongs of constitutional dimension." *Sanchez-Llamas v. Oregon*, 548 U.S. 331, 345 (2006) (quoting *Smith v. Philips*, 455 U.S. 209, 221 (1982)) (internal quotation marks omitted).

Under *Jackson*, this Court's role is simply to determine whether there is any evidence, if accepted as credible by the trier of fact, sufficient to sustain conviction. *Schlup v. Delo*, 513 U.S. 298, 330 (1995). The United States Supreme Court has recently even further limited a federal court's scope of review under *Jackson*, holding that "a reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury." *Cavazos v. Smith*, 132 S. Ct. 2, 4 (2011) (per curiam). *Jackson* "makes clear that it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial." *Cavazos*, 132 S. Ct. at 3-4. Under *Cavazos*, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was 'objectively unreasonable.'" *Id.* at 4 (*quoting Renico v. Lett*, 559 U.S. 766, 773 (2010)).

The Court of Appeal considered and rejected Corral's insufficiency of the evidence claim on direct appeal as follows:

Corral claims his rape convictions should be reversed because although he directed the other men to search the wife for weapons prior to the rapes, that was not a direction to rape her.

We review a challenge to the sufficiency of evidence by determining from the entire record whether a reasonable jury could have found that the prosecution sustained its burden of proof. (*People v. Mincey* (1992) 2 Cal.4th 408, 432.) In doing so, we consider the evidence in a light favorable to the judgment and we "presume the existence of every fact the trier could reasonably deduce from the evidence in support of the judgment." (*Ibid.*) "The test is whether substantial evidence supports the decision, not whether the evidence proves guilt beyond a reasonable doubt." (*Ibid.*) As to witness credibility, we must defer to the trier of fact. (*People v. Barnes* (1986) 42 Cal.3d 284, 303–304.) If the findings are reasonably justified by substantial evidence, "reversal is not warranted merely because the circumstances might also be reasonably reconciled with a contrary finding." (*People v. Redmond* (1969) 71 Cal.2d 745, 755.) In fact, to set aside a jury verdict, "it must clearly appear that upon no hypothesis whatever is there sufficient substantial evidence to support it." (*Ibid.*)

Liability for a crime falls on those who directly commit the act constituting the offense as well as on those who aid or abet in its commission; all are liable under the law as principals. (§ 31.) One who aids or abets a crime is not only guilty of the crime he knew his confederates contemplated but also of any other reasonably foreseeable offenses they commit. (*People v. Croy* (1985) 41 Cal.3d 1, 12, fn. 5.) In other words, a defendant is liable for all the natural and reasonable consequences of acts he knowingly aids or encourages. (*Ibid.*)

When the group of men broke into the wife's apartment, she was asleep in her bed wearing a nightgown. The driver, identified at trial as Corral, grabbed the wife by the hair or by her arm and forced her into the Suburban. When they failed to find her husband and began driving toward the levee, Corral told the others he intended to "get rid of her."

It was in the context of getting money from her husband that Corral ordered the wife "searched" and in the context of going to a place to "get rid of" the wife that the rapes and forced oral copulation occurred. The men in the backseat beat her, called her names and threatened her with death while the sex demands escalated. Defendant Langarica pushed her over the seat into the cargo area. Ortega remembered hearing Langarica say "suck it" while the wife cried; Ortega also heard her saying no and crying while another man pinned her on her back, raping her. The wife said two men successively penetrated her vagina with their penises while she was in the cargo area of the vehicle. One of them also penetrated her anus. The sexual assault continued until the vehicle came to a stop. After the stop on a dark road, Corral got out and ordered the naked victim to give him oral sex. When interviewed by police immediately after the crimes, the wife had muddy feet, a swollen arm and many scratches and marks on her body.

All of the witnesses agreed that the driver (Corral) forced the wife to orally copulate him at the levee. They did not agree on which of the other men sexually assaulted her as they drove there. However, viewing the evidence in the light most

favorable to the verdict, a reasonable fact finder could conclude from the evidence that although only Corral and two other men personally sexually assaulted the wife, all five either actively participated in the sexual assaults or were "'concerned'" with their commission.  (*See People v. Nguyen* (1993) 21 Cal. App. 4th 518, 529 [however slight the "'concern'" may have been, liability attaches if a defendant with the requisite state of mind directly or indirectly aids the actual perpetrator of a sex crime].)

Whether sex crimes were the natural and probable consequence of the other charged crimes is a question of fact for the jury.  (*People v. Nguyen*, *supra*, 21 Cal. App. 4th at p. 531.)  Even when sex crimes are committed "'on the spur of the moment,'" as defendants argue happened here, aider and abettor liability can attach instantaneously, and rape is not uncommon in home invasion robberies, particularly where the intruders bring sufficient numbers to overcome any potential resistance.  (*Id.* at pp. 532-533.)  The test for liability is "whether a reasonable person in the defendant's position would have or should have known that the charged offense was a reasonably foreseeable consequence of the act aided and abetted."  (*Id.* at p. 535.)  A reasonable person would expect that five men forcing their way into an apartment at 1:00 a.m. wielding bats and canes might encounter a woman who could be forced to submit to whatever demands they might make of her, including sexual violence.

If it was not obvious when the five men broke down the door of the wife's apartment that sex crimes were foreseeable, it certainly became foreseeable as they dragged her out of her bed in her nightgown and as they later drove her to a remote location.  As the likelihood of sexual assault escalates from possible or likely to certain, and as a group of assailants continues to aid and assist the endeavor, "it will not do" for them to later assert "they were concerned only with robbery and bear no responsibility for the sexual assault."  (*People v. Nguyen*, *supra*, 21 Cal. App. 4th at p. 534.)

Aider and abettor liability attaches where (1) the aider and abettor knows the unlawful purpose of the direct perpetrator, (2) the aider and abettor intends to commit, encourage or facilitate the commission of the offense, and (3) the aider and abettor's acts or advice aids, promotes, encourages or instigates the commission of the offense.  (*People v. Beeman* (1984) 35 Cal.3d 547, 561.)  An aider and abettor's guilt is based on a combination of the direct perpetrator's acts and the aider and abettor's own acts and mental state.  (*People v. McCoy* (2001) 25 Cal. 4th 1111, 1117.)

Because an aider and abettor's culpability depends on his own mental state, in some circumstances, he may be guilty of a greater or lesser crime than the direct perpetrator.  (*People v. McCoy*, *supra*, 25 Cal. 4th at p. 1120; *People v. Lopez* (2011) 198 Cal. App. 4th 1106, 1118.)  There was no evidence here, however, of any distinction among the five assailants.  Although the language "'equally guilty'" is no longer in pattern jury instructions, the concept remains a generally correct statement of law.  (*People v. Lopez*, *supra*, 198 Cal. App. 4th at p. 1119; *People v. Samaniego* (2009) 172 Cal. App. 4th 1148, 1165.)  Even if Corral's order to search the wife was not a direct order to rape her, it is reasonably foreseeable that a group of young men forcibly "patting down" the body of a frightened woman in a nightgown would proceed to disrobe and sexually violate her.  It is also reasonably foreseeable that a group of five men who

collectively kidnap a woman from her bed might soon use the same intimidating force to sexually assault her.

The law did not require the jury to conclude that [Corral and Langarica] individually, intentionally and directly participated in each of the sex crimes for which they were charged and convicted. There was substantial evidence that both were willing participants in an escalating criminal episode in which the wife was sexually assaulted by three of the five assailants, and that all five actively participated in the intimidation that facilitated the robbery, kidnapping and sexual assaults. The evidence was sufficient to support the verdicts because sexual assault was a natural and probable consequence of the kidnapping, which was a natural and probable consequence of the late-night home invasion and robbery.

*Langarica*, 2014 WL 4735000, at *4-7.

The appellate court's holding is both reasonable and fully supported by the record. Determination of whether a crime is the natural and probable consequence of a target crime involves an objective, factual analysis. *People v. Prettyman*, 926 P.2d 1013, 1039 (Cal. 1996). Based on the evidence as enumerated in the appellate opinion, this Court cannot conclude that the California Court of Appeal's rejection of Corral's insufficiency claim was an objectively unreasonable application of *Jackson*. When the evidence is viewed in the light most favorable to the prosecution, a rational trier of fact could have found beyond a reasonable doubt sufficient evidence to support Corral's rape convictions. *See Juan H. v. Allen*, 408 F.3d 1262, 1278 n.14 (9th Cir. 2005). Accordingly, the state court's rejection of Corral's claim was neither contrary to nor an unreasonable application of clearly established federal law, and Corral is therefore not entitled to habeas relief.

Ground 3.     *Sentencing Error*

Corral additionally contends that the trial court violated his due process rights when it failed to stay sentencing under § 654 or impose concurrent, rather than consecutive, terms on his convictions on Counts 5 (assault with intent to commit sex crimes), 7 (burglary), and 8 (criminal

threats).  Corral raised this argument on direct appeal, alleging that the burglary was incidental to the planned robbery of Gustavo, the criminal threats made to the wife were part of the robbery and kidnapping crimes, and the assault with intent to commit sex crimes could not be separately punished from the sex crimes that followed.  Relying on state case law and statutory law, the appellate court rejected his claim, concluding there was ample support for the trial court's implicit findings of separate objectives and intents for the resulting convictions and that there was substantial evidence to support the trial court's imposition of consecutive rather than concurrent sentences.  *Langarica*, 2014 WL 4735000, at *10-11.

The thrust of Corral's claim in the Petition before this Court is that the trial court improperly imposed his sentence in violation of Penal Code § 654.  The essence of this argument is that the state appellate court's interpretation of California sentencing law is incorrect, but this Court is bound by the state court's interpretation of California state law.  *See Bradshaw*, 546 U.S. at 76.  A petitioner may not transform a state-law issue into a federal one by simply asserting a violation of due process.  *See Langford v. Day*, 110 F.3d 1380, 1389 (9th Cir. 1996).

And even if this Court were to construe Corral's Petition liberally to assert a federal constitutional claim, *see Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam), Corral fares no better when analyzing his claim as an alleged violation of the federal double jeopardy protections.  The Double Jeopardy Clause of the Constitution provides that no person shall "be subject for the same offen[s]e to be twice put in jeopardy of life or limb."  U.S. CONST. amend. V.  The clause is enforced against the states through the Fourteenth Amendment. *Benton v. Maryland*, 395 U.S. 784, 787 (1969).  The Supreme Court has previously held that this clause protects against successive prosecutions for the same offense after acquittal or conviction and

against multiple criminal punishments for the same offense. *Monge v. California*, 524 U.S. 721, 727-28 (1998) (citing *N. Carolina v. Pearce*, 395 U.S. 711, 717 (1969), *overruled on other grounds by Alabama v. Smith*, 490 U.S. 794 (1989)).

"[W]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not . . . ." *Brown v. Ohio*, 432 U.S. 161, 166 (1977) (quoting *Blockburger v. United States*, 284 U.S. 299, 304 (1932)). "If each requires proof of a fact that the other does not, the *Blockburger* test is satisfied, notwithstanding a substantial overlap in the proof offered to establish the crimes." *Id.* at 166 (quoting *Iannelli v. United States*, 420 U.S. 770, 785 n.17 (1975)). In this case, Corral was convicted under state law of separate, distinct criminal acts—kidnapping, assault with intent to commit sex crimes, robbery, burglary, criminal threats, and multiple sex crimes. The offenses require under state law proof of distinct elements to support convictions. Thus, the convictions do not violate the "same elements" test of *Blockburger*, 284 U.S. at 304, and Corral is not entitled to relief on that ground either.

Ground 4.     *Joinder*

Finally, Corral "hereby joins in, and adopts by reference, all issues and arguments raised by his co-defendant Gabriel Armando Langarica in his petition that may accrue to [Corral's] benefit." In California state courts, appellants are permitted to join in, or adopt by reference, all or part of the appellate arguments raised by another party in the same or a related appeal. *See* Cal. Ct. R. 8.200(a)(5). The Rules Governing Section 2254 Cases in the United States District Courts, however, do not permit such joinder arguments. Rather, a federal habeas "petition must:

(1) specify all the grounds for relief available to the petitioner; [and] (2) state the facts supporting each ground." Rule 2(c)(1)-(2), Rules Governing Section 2254 Cases in the United States District Courts. Pleadings from *pro se* prisoners are meant to be liberally construed. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam). "Despite this liberal construction, *pro se* petitioners are nevertheless bound by the most basic rules of procedure with respect to their pleadings." *Cortez v. Clark*, No. 10-cv-0147, 2011 WL 883019, at *11 (S.D. Cal. Mar. 14, 2011) (citing *King v. Atiyeh*, 814 F.2d 565, 567 (9th Cir.1987), *overruled on other grounds by Lacey v. Maricopa Cty.*, 693 F.3d 896 (9th Cir. 2012))). "By joining in and adopting 'any' arguments that might be beneficial to him, Petitioner fails to articulate a claim, and underlying supporting facts, specific to himself." *Id.* Accordingly, Corral's joinder claim fails to state facts sufficient to allege a federal constitutional violation, and he is not entitled to relief on it.[4]

## V. CONCLUSION AND ORDER

Corral is not entitled to relief on any ground raised in his Petition.

**IT IS THEREFORE ORDERED THAT** the Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court declines to grant a Certificate of Appealability. *See* 28 U.S.C. § 2253(c); *Banks v. Dretke*, 540 U.S. 668, 705 (2004) ("To obtain a certificate of appealability, a prisoner must 'demonstrat[e] that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the

---

[4]      In any event, as previously mentioned, this Court, through a different District Judge, denied Langarica's habeas petition. *See Langarica v. Frauenheim*, No. 2:16-cv-0080, 2017 WL 2972588, at *12 (E.D. Cal. July 12, 2017), *report and recommendation adopted*, Case No. 2:16-cv-0080, Dockets 22, 23.

issues presented are adequate to deserve encouragement to proceed further.'" (quoting *Miller-El*, 537 U.S. at 327)).  Any further request for a Certificate of Appealability must be addressed to the Ninth Circuit Court of Appeals.  *See* FED. R. APP. P. 22(b); 9TH CIR. R. 22-1.

The Clerk of the Court is directed to enter judgment accordingly.

Dated: August 5, 2019.

    /s/James K. Singleton, Jr.    <br>
JAMES K. SINGLETON, JR.<br>
Senior United States District Judge